UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
FLEXIBLE FINANCE INC.,                                    :
                                                         :
                              Plaintiff,                 :
                                                         :
       v.                                                :        No.
                                                         :
                                                         :
VISIBLE IDEAS, INC. dba SPLIT PAY, and                   :
ALEX ANDERSON,                                           :
                                                         :
                              Defendants.                :
-----------------------------------------------------------------x

**<u>COMPLAINT</u>**

Plaintiff Flexible Finance, Inc. ("Flex"), by and through undersigned counsel, alleges for its Complaint against Defendants Visible Ideas, Inc., dba Split Pay ("Split Pay"), and Alex Anderson (collectively, "Defendants") as follows:

## **NATURE OF ACTION**

1.     This action arises from the intentional misappropriation of competitive trade secrets.  Defendants Split Pay and its newly-minted Chief Financial Officer ("CFO"), Anderson, exploited the trust Plaintiff Flex placed in Anderson to steal Flex's most valuable and closely guarded trade secrets, and then used that stolen information as the blueprint for expanding Split Pay's own competing business and targeting Flex's business partners. What Defendants took was not information casually encountered in the ordinary course of business — it was Flex's financial and strategic crown jewels, obtained under the cover of a confidentiality agreement that Anderson brazenly disregarded.

2.     Flex extended Anderson a rare degree of trust. In early 2026, and for the sole and express purpose of evaluating Anderson's candidacy to become Flex's CFO, Flex agreed, subject to a written nondisclosure agreement ("NDA"), to provide Anderson access to information it discloses to almost no one outside the company and very few within it. This information includes Flex's most sensitive financial model, the "Flex Margin Model," as well as a confidential memorandum to its board of directors detailing the company's strategic analysis, financial models, and future business plans. Anderson did not passively receive this material — he affirmatively sought it out, personally requesting the Flex Margin Model.

3.     Anderson did not honor the trust Flex placed in him. Upon information and belief, at the very time Anderson was mining Flex's leadership for its most sensitive strategic and financial information, he was considering employment (if not actively engaged in discussions)

with Split Pay — a Flex competitor staffed by former Square, Inc. (now Block, Inc.) employees, with whom Anderson had maintained an ongoing relationship, as part of a group of former colleagues who referred to themselves as the "Square Mafia," long before he ever sat down with Flex. At no point during the entire interview process — or afterwards — did Anderson disclose to Flex that he was pursuing, or even considering, a position with any competitor, let alone Split Pay.

4.      Flex ultimately declined to hire Anderson. Upon information and belief, rather than abide by his obligations to maintain the confidentiality of the information he had received, Anderson turned to the very competitor he had been secretly considering all along, using the trade secret information he had received from Flex — including the Flex Margin Model and a board memorandum — to benefit Flex's direct competitor in direct violation of the NDA he had signed. Anderson went on to join Split Pay as CFO in July 2026.

5.       Split Pay swiftly exploited the confidential and trade secret information obtained by Anderson for its own benefit. For years, Split Pay had pursued a direct-to-consumer business model, and its own Chief Executive Officer ("CEO") had disclaimed any interest in a business-to-business partnership strategy. Flex, on the other hand, had spent years and substantial resources developing the economics of its business-to-business strategy, the structure of which it has never publicly disclosed. Yet, shortly after obtaining Flex's strategic financial and business planning documents, Split Pay abruptly reversed course, rolling out a shockingly similar business-to-business model that exploits the confidential economic model Flex built over years of investment and iteration — a change in business strategy no honest competitor would plausibly have entered into from scratch in so short a time. Split Pay also used its illicit knowledge of Flex's confidential partnership terms to directly target Flex's own long-standing

2

business partners in an effort to undercut Flex in the very market it had spent years cultivating.

6.     When confronted, Defendants chose concealment over candor. On July 14, 2026, after growing alarmed at the unmistakable signs that its trade secrets had been compromised, Flex demanded that Split Pay and Anderson provide written assurances that they had not used or disclosed Flex's confidential information and requested a response by July 17, 2026. Anderson eventually responded on July 23, 2026 but remained suspiciously silent on the key question of whether he had used or shared Flex's trade secrets or even whether he still had the underlying documents in his possession. As of the filing of this Complaint, Split Pay has failed to respond or offer any assurance that Flex's misappropriated trade secrets are not being used against it.

7.     Flex brings this action to hold Defendants to account for what, as alleged herein, was a deliberate scheme to deprive Flex of the benefit of years of investment and to steal the fruits of its labor and to prevent further dissemination and misuse of Flex's confidential and trade secret information. Defendants' conduct, as set forth below, was willful, fraudulent, and undertaken in bad faith, and it has caused, and continues to cause, serious and irrevocable harm to Flex's business, its competitive position, and the confidential relationships it built over years of honest effort.

## THE PARTIES

8.     Plaintiff Flex is a Delaware corporation with its principal place of business at 228 Park Avenue South #75995, New York, NY, 10003.

9.     Upon information and belief, Defendant Split Pay is a Delaware corporation with its principal place of business at 1688 Meridian Avenue, Suite 520, Miami Beach, FL, 33139.

10.     Upon information and belief, Defendant Anderson is currently working for Split Pay as its Chief Financial Officer and resides in Orinda, CA.

3

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.

12.     This Court has supplemental jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1367 because those claims arise from the same common nucleus of operative facts as the federal claim.

13.     This Court has personal jurisdiction over Anderson because Anderson consented to personal jurisdiction in this District. Before receiving Flex's confidential and trade secret information, Anderson executed a nondisclosure agreement with Flex, which provides that "[e]xclusive jurisdiction and venue for any action arising under this Agreement shall be in the federal and state courts located in the City and State of New York."

14.     This Court has personal jurisdiction over Split Pay under New York's long-arm statute, including C.P.L.R. § 302(a)(3) because Split Pay committed tortious acts outside of New York that caused injury to Flex in New York.

15.     Split Pay is subject to personal jurisdiction under C.P.L.R. § 302(a)(3)(i) because Split Pay regularly solicits and conducts business in New York and derives revenue from services rendered in New York. Split Pay markets its services nationwide, including to customers in New York.

16.     Split Pay is also subject to personal jurisdiction under C.P.L.R. § 302(a)(3)(ii) because Split Pay expected or reasonably should have expected its misconduct to have consequences in New York and it derives substantial revenue from interstate commerce. Split Pay knew or reasonably should have known that Flex is headquartered in New York, that Flex's trade secrets belonged to and were used by Flex in New York, and that misappropriating those

4

trade secrets would harm Flex in New York. Split Pay derives substantial revenue from interstate commerce by providing its services across the United States.

17.    The exercise of personal jurisdiction over Split Pay is reasonable and consistent with due process because Split Pay conducted business in New York and purposefully acquired and used Flex's trade secrets knowing that their misuse would cause competitive and economic injury to Flex in New York.

18.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Flex's claims occurred in this District. Flex is headquartered in New York City, develops and maintains its trade secrets in New York, and suffered injury in New York from Defendants' misappropriation.

19.    Venue is proper as to Anderson because he contractually agreed that exclusive jurisdiction and venue for any action arising under the nondisclosure agreement would lie in the federal and state courts located in the City and State of New York.

20.    Venue is proper as to Split Pay because Split Pay acquired, used, and benefitted from Flex's trade secrets knowing that they belonged to Flex in New York, and Defendants' conduct caused substantial injury to Flex in this District.

## FACTUAL ALLEGATIONS

I.    **Flex is an innovator and industry leader in the areas of financial technology and personal finance.**

21.    Founded in 2019 and headquartered in New York City, Flex is a financial technology company that allows users to split rent or other recurring bills into smaller, paycheck-friendly payments. Flex provides its services to customers in all 50 states.

22.    Flex's flagship service is its Flex Rent service, which gives users access to a line of credit through FDIC-insured partner banks that helps split the user's rent into two payments

each month. The process is simple: (1) the user makes an initial downpayment of half their rent to Flex; (2) Flex pays the user's entire rent to the property manager when it is due; and (3) the user then pays the second half of their rent to Flex later in the month. By allowing users to break rent payments up into two monthly installments, Flex helps users take control of their finances, build credit, and weather unexpected financial expenses.

23.     Since its founding, Flex has helped more than three million renters, including two million in 2025 alone. Flex is consistently very highly rated by its customers. For example, Flex has an "excellent" 4.6 rating on Trustpilot, with reviewers "overwhelmingly" reporting "a great experience" and praising Flex for "easing financial management and stress."

24.     Flex has seen significant growth over the past seven years in terms of both users and revenue. After months of planning and market testing, Flex has recently expanded into new services, moving beyond rent to offer flexible payment for cars, mortgages, utilities and other monthly expenses. From a fledgling start up, Flex has grown into an award-winning financial technology industry leader.

25.     A key part of Flex's business success is the many partnerships that it has developed with businesses that receive Flex's user's payments, including in particular property management companies ("PMCs") that manage portfolios of rental properties as well as management software providers ("MSPs") that centralize and manage information technology operations for property managers. Flex's Flex Rent service integrates seamlessly with the rent payment systems used by PMCs and MSPs and benefits these partners by ensuring timely and complete rent payments and reducing delinquencies and evictions.

II.    **Flex has expended significant resources developing confidential and trade secret information to inform its business strategies.**

26.     Flex's success – particularly its success in partnering with PMCs and MSPs – did

6

not happen by chance. Rather, it is the result of years of research and innovation. Over the past seven years, Flex has poured thousands of hours of time and millions of dollars into developing its business strategies, including go-to-market plans, detailed financial models, and optimized commercial terms. These confidential and trade secret strategies are the blueprint for Flex's business success and would be highly valuable to any competitor.

27.     Many of Flex's business and financial trade secrets are contained in a dynamic, multi-tab spreadsheet, called the Flex Margin Model, that allows Flex to create forward-looking financial models based on variable inputs and assumptions. This model is powered by Flex's proprietary financial and business information, including among many other things: (1) actual and projected financials for various Flex business channels; (2) detailed user data, including number of users, unit network/distribution size, PMC adoption dynamics, etc.; and (3) contract terms for specific business partners. This model is used by Flex to inform and guide its strategic decision-making, including which business channels to pursue and expected financial results. It also contains and reflects insights on how to approach business-to-business relationships in the marketplace for flexible rent payment arrangements. A person with access to the Flex Margin Model could evaluate the economics of Flex's existing and potential business channels, identify the assumptions that drive profitability, understand the contract terms Flex can offer to individual business partners, and copy or undercut those terms.

28.     Some of the information in the Flex Margin Model, along with detailed discussions of strategic decisions the company has made or is considering making (and the current results of those decisions), are also contained in Flex's confidential quarterly update memoranda to its board of directors.

29.     Among many other things, board memoranda contain past financials, forward-

looking financial models, growth rates, margins, product development, and risk analysis. These memoranda are used by Flex's officers and directors to chart the future course of the company.

### III.  Flex protects its confidential information and trade secrets.

30.  Flex takes seriously the protection of its confidential information and trade secrets, including the Flex Margin Model and quarterly update memoranda to its board, and deploys substantial measures to maintain the secrecy of this information.

31.  Among other measures, Flex requires all employees to sign confidentiality agreements prior to joining the company. And even within Flex, sensitive, proprietary financial and business strategy documents, such as the Flex Margin Model, are stored on drives that are accessible only to a limited number of employees and distributed on a need-to-know basis.

32.  To the extent Flex's financial and business strategy documents or information are shared outside of Flex, Flex requires the recipients, such as Anderson, to sign NDAs.

33.  Flex also protects the details of its business partnerships by entering into confidentiality agreements with its business partners that prohibit them from sharing certain contract terms with others.

### IV.  Split Pay is an industry upstart that does not have Flex's level of industry experience or track record and that has consistently cut corners to try to compete with Flex.

34.  Upon information and belief, Visible Ideas, Inc. was founded in 2022, and it launched its Rent App service in early 2024. In or about early January 2026, it rebranded Rent App to Split Pay.

35.  As a relatively new entrant in the market, Split Pay does not possess Flex's level of industry experience, relationships, reputation, or track record in financial technology or personal finance. For example, Flex partners with FDIC-insured banks to originate its loan products and possesses state licenses for various regulated activities such as loan brokering, loan

8

servicing, and debt collection. Split Pay, on the other hand, brought its copycat loan products to market without the sponsorship of any originating financial institution, nor does it possess the licenses to lawfully conduct its regulated activities.

36.    Upon information and belief, until very recently, Split Pay's business has focused almost exclusively on marketing its services directly to consumers for rental payments. While Split Pay made sporadic efforts in 2025 and early 2026 to encourage landlords to market Split Pay's services, upon information and belief, prior to the second quarter of 2026, Split Pay did not pursue a business-to-business partnership model based on an economic structure substantially similar to Flex's and did not market to any potential channel partners in the multifamily industry. Indeed, as late as March 2026, Split Pay's CEO Andrew Borovsky told Flex founder and CEO Shragie Lichtenstein that Split Pay had no interest in pursuing a business-to-business partnership strategy. Also, upon information and belief, prior to the second quarter of 2026, Split Pay did not offer payment services outside of rent.

37.    During its relatively short time in the market, Split Pay has earned a reputation for poor customer service. For example, Split Pay's Trustpilot score is only 3.0, with customers noting "significant issues" with customer service, describing it as "unresponsive or unhelpful." Many experienced issues with "payments being delayed" or not being processed correctly, often resulting in unexpected late fees. Concerns were also raised about Split Pay's reliability, with some customers finding its application and service "unreliable."

38.    Flex has long had concerns about Split Pay's efforts to obtain and use Flex's confidential business information to unfairly compete with Flex. For example, in April 2024, Flex hired a sales representative for its Deep Small and Medium-Sized Business ("DSMB") division, where he had access to confidential Flex business information, subject to an employee

9

confidentiality agreement. The sales representative left Flex in September 2024. Upon information and belief, shortly after leaving Flex (or possibly while still employed by the company), the sales representative joined Split Pay. Upon information and belief, about a month later, in October 2024, Split Pay publicly released a DSMB sales video that was substantially similar to Flex's confidential sales materials.

39.    Concerned about these similarities, Flex sent a cease-and desist letter to the former employee and Split Pay seeking clarity on the sales representative's employment history with Split Pay and assurances that the former employee would comply with his confidentiality obligations to Flex. That same day, Borovsky texted Lichtenstein explaining that Split Pay had already fired the former Flex employee and asking, "What's with the lawyer letters?" Neither Borovsky nor Split Pay ever responded to Flex's requests for clarity or assurance.

40.    Split Pay has also engaged in a pattern of deceptive and misleading business practices to attempt to unfairly compete with Flex.

41.    For example, in 2026 Split Pay pursued a cross-channel advertising campaign focused on misrepresenting Flex and its services. A centerpiece of the campaign was a comparison page that promulgated at least thirteen false or misleading statements about Flex and its business, including that Flex requires a "hard pull" credit check, which is false, that the time to approve is "often days" and that most applicants are "rejected outright," both of which are false, and that using Flex will require "workflow changes" and risk chargebacks, which are also false.

42.    Flex has been forced to repeatedly warn Split Pay about its false and misleading claims and demand corrections. Split Pay has never attempted to substantively defend its marketing claims. Instead, each time Split Pay has purported to withdraw one set of misleading

claims, it has shifted to new, equally misleading marketing tactics.

43.     Additionally, in early 2026 Split Pay offered to sell itself to Flex. The parties engaged in preliminary confidential negotiations about a potential transaction. However, Flex chose not to move forward with the discussions due to concerns identified during the review process.

V.     **In reliance on Anderson's contractual promise of confidentiality, Flex entrusted him with access to its trade secret and confidential information as part of his interview process.**

44.     Anderson was initially introduced to Flex on or about May 6, 2025 and had an introductory call with Lichtenstein the following day. Anderson and Lichtenstein exchanged a few follow-up emails in May and November 2025.

45.     On or about March 2, 2026, Anderson was reintroduced to Flex through Flex's Chief People Officer and had an initial screening interview with Lichtenstein at the Fairmont Hotel in San Francisco on or about March 5, 2026.

46.     On or about March 25-27, 2026, Anderson participated in a series of remote interviews with members of Flex's senior leadership team, including Lichtenstein, Chief Operating Officer Christina Edling, Chief Revenue Officer Ian Simons, and Chief Legal Officer Danny Gordon.

47.     As the interview process had progressed substantially, Flex asked Anderson to prepare and present a case study outlining his overarching vision for Flex's financial organization. Because this exercise would require access to certain confidential Flex information, Anderson was required to sign an NDA before proceeding.

48.     Accordingly, on March 27, 2026, Flex and Anderson entered into a written NDA. The NDA provides in relevant part:

11

This Non-disclosure Agreement (the "Agreement"), effective as of the date of last signature below (the "Effective Date"), is between Flexible Finance, Inc. ("Flex"), a Delaware corporation, and the counterparty set forth in the signature block below ("Counterparty," and together with Flex, the "parties" and each individually a "party"). To explore the possibility of a business relationship between the parties (the "Potential Transaction"), a party ("Discloser") may disclose sensitive information to the other party ("Recipient") or its respective directors, officers, employees, counsel, agents and advisors (collectively, "Representatives"). To explore the possibility of an employment opportunity with Flex, Flex ("Discloser") may disclose sensitive information to you ("Recipient") (each a "party," and together the "parties"). The parties agree as follows:

1.      **Confidential Information.** "Confidential Information" means, to the extent disclosed by or for Discloser to Recipient on or after the Effective Date, all financial, business, legal, and technical information of Discloser or any of its affiliates, suppliers, customers or employees (including information about research, development, operations, marketing, transactions, regulatory affairs, discoveries, inventions, methods, processes, articles, materials, algorithms, software, specifications, designs, drawings, data, strategies, plans, prospects, know-how and ideas, whether tangible or intangible, and including all copies, abstracts, summaries, analyses and other derivatives thereof), in each case that is marked or otherwise identified as proprietary or confidential at the time of disclosure, or that by its nature would be understood by a reasonable person to be proprietary or confidential. Confidential Information shall not include any information that (a) was rightfully known to Recipient without restriction before receipt from Discloser, (b) is rightfully disclosed to Recipient or its Representatives without restriction by a third party, (c) is or becomes generally known to the public without violation of this Agreement by Recipient or its Representatives or (d) is independently developed by Recipient or its Representatives without access to or reliance on such information.

…

3.      **Restrictions.** As to the other party's Confidential Information, Recipient agrees (a) to use the Confidential Information only for its consideration internally of the Potential Transaction or other business relationship between the parties (the "Permitted Purpose"), and its performance in any resulting arrangement, and not for any other purpose, (b) to maintain the Confidential Information as confidential and exercise commercially reasonable precautions to prevent any unauthorized access, use or disclosure, (c) not to copy the Confidential Information except as reasonably necessary for the Permitted Purpose, (d) not to disclose the Confidential Information to any third party other than Recipient's Representatives who have a need to know for the Permitted Purpose and who are bound by confidentiality obligations with respect to the Confidential Information no less strict than those contained herein, (e) not to decompile, disassemble or otherwise reverse engineer any Confidential Information, or use any similar means to

12

discover its underlying composition, structure, source code or trade secrets and (f) not to export or re-export any Confidential Information or product thereof in violation of U.S. or other export control laws or regulations. The terms and conditions of any transaction or possible transaction between the parties, the fact that disclosures, evaluations or discussions are taking place, and the status and results thereof will also be held in confidence by both parties and not disclosed to any third party. Each party shall be responsible for any breach of its confidentiality obligations by its respective employees and agents.

49.     The NDA further acknowledges: "Due to the unique nature of the Confidential Information, the parties agree that any breach or threatened breach of this Agreement may cause not only financial harm to Discloser, but also irreparable harm for which money damages may not be an adequate remedy."

50.     Following the execution of the NDA, Flex provided Anderson with a copy of a memorandum to Flex's Board of Directors for the fourth quarter of 2025 (the "Board Memorandum"). The 37-page memorandum contains detailed confidential and trade secret information relating to Flex's performance in 2025 as well as financial planning and business strategies for 2026 and beyond.

51.     On or about March 30, 2026, in preparation for his case study presentation, Anderson participated in two fact-finding meetings with members of Flex's finance and housing teams, where he was able to ask, and did ask, more specific questions about Flex's financial plans and business strategies. Flex's finance and housing team members orally provided Anderson with additional confidential and trade secret information, including information regarding Flex's financial modeling, the economics of its deal terms with strategic partners, and its strategic priorities, all subject to the NDA.

52.     Shortly after the second fact-finding meeting, Anderson requested the Flex Margin Model, which was something that Flex had not previously provided to any candidate for its CFO position and which no other candidate had requested. The Margin Model contains

13

detailed breakdowns of virtually every aspect of Flex's business, its financial modeling, its unit economics, and deal terms with its most important strategic partners.  It comprises immensely valuable and proprietary trade secret information, which is highly guarded even within the company.

53.     Following some internal consideration and given that Anderson was in the final stages of the interview process to take on the trusted role of CFO, Flex provided Anderson with the Flex Margin Model the morning of March 31, 2026, subject to the NDA.

54.     Anderson's final interview took place late in the afternoon on March 31, 2026, where he presented his case study to a group of Flex executives, including Lichtenstein.

55.     During the entire interview process, Anderson never informed Flex that he was considering or seeking a similar position with any other company and certainly not any of Flex's competitors, such as Split Pay.  Had Flex known that Anderson was considering employment or in discussions with Split Pay, it would never have provided him with confidential and trade secret information regarding its business and future strategies.

56.     On April 10, 2026, Lichtenstein informed Anderson that Flex did not intend to make him an employment offer.

VI.    **Anderson disclosed Flex confidential and trade secret information to Split Pay, which Split Pay immediately began to incorporate into its business model.**

57.     Upon information and belief, Anderson formally interviewed for Split Pay's CFO position in or around the second quarter of 2026.

58.     Upon information and belief, from 2019 to 2025, Anderson worked in the finance department at Cash App, an operating unit of Block, Inc. (formerly Square, Inc.), overlapping with Split Pay Co-Founder and CEO Borovsky.

59.     Upon information and belief, after their respective departures, a group of former

14

Square executives, including Anderson and Borovsky, stayed in contact with each other, referring to themselves as the "Square Mafia."

60.    Upon information and belief, during or shortly after his interview process with Flex, Anderson continued to communicate with Split Pay executives, including but not limited to Borovsky, sharing Flex confidential and trade secret information, including information contained in the Flex Margin Model and Board Memorandum – information clearly subject to Anderson's NDA.

61.    Upon information and belief, at the time Split Pay received Flex's confidential and trade secret information from Anderson, Split Pay knew or had reason to know that Anderson had received the information from Flex subject to an NDA. Upon information and belief, despite knowing that Anderson was contractually bound not to disclose the information, Split Pay solicited, accepted, and used the confidential and trade secret information Anderson provided.

62.    Upon information and belief, following Anderson's receipt of Flex confidential and trade secret information, Split Pay made a hard, virtually overnight, pivot from its longtime business strategy from focusing almost exclusively on direct-to-customer sales of its rent payment product to launching a business-to-business strategy based on an economic model nearly identical to Flex's strategy.

63.    Upon information and belief, on or around June 23, 2026, Split Pay launched a PMC-facing website directly targeting PMCs to engage in partnerships based on specific contract terms drawn from Flex's confidential and trade secret information.

64.    According to its recently-launched PMC website, Split Pay is now offering specific deal terms substantially similar to those offered by Flex, as reflected in the Flex

15

Financial Model. Upon information and belief, Split Pay began offering these very specific deal terms for the first time in approximately June 2026 without any prior iteration, market testing, or serious investment.

65.    Upon information and belief, the economic structure of Split Pay's newly-minted business model is derived from confidential and trade secret information provided to Anderson, subject to an NDA, after years of investment and iteration.

66.    Upon information and belief, armed with specific contract terms for one of Flex's most valuable business partners — as set forth in the Flex Margin Model — Split Pay immediately targeted that partner in an effort to steal its business from Flex by potentially undercutting its terms. As a result, that partner is now demanding to renegotiate its partnership with Flex.

67.    In or around June 2026, Split Pay also launched a YouTube channel dedicated to PMC sales, again touting its partnership contract terms that are substantially similar to, and upon information and belief, derived from the Flex Margin Model.

68.    Upon information and belief, Split Pay did not develop (and could not have developed) such specific deal terms in a matter of a few months without using Flex's confidential and trade secret information. Indeed, without access to Flex's confidential and trade secret information, Split Pay lacked any direct experience with business-to-business deal terms or the unit economics that would support such programs.

69.    Upon information and belief, since June 2026, Split Pay has also expanded the scope of its business beyond its previous exclusive focus on rent payments, now offering its payment splitting services for other monthly expenses, with a particular focus on automobile and mortgage payments. The specific business strategies and economic modeling to successfully

16

implement these new services are described and analyzed in detail in the Flex confidential and trade secret information obtained by Anderson, including the Flex Margin Model and the Board Memorandum.

70.     Upon information and belief, on or around June 2026, Split Pay began an aggressive advertising campaign for its new automobile and mortgage payment services, launching a user interface for automobile onboarding the same month. And upon information and belief, on or around July 10, 2026, Split Pay updated its mobile application to permit splitting automobile and mortgage payments, again utilizing confidential and trade secret information developed by Flex.

71.     Upon information and belief, even if Split Pay were considering expanding into new areas, it would not have pivoted so quickly and aggressively to these new business channels without knowledge of Flex's internal financial modeling and specific business strategies, which provide Split Pay with the necessary insights to deploy these strategies effectively and understand their specific economic benefits, which Flex spent years and millions developing and testing in the market.

VII.    **Split Pay and Anderson refuse to provide any assurance that they are not using Flex's trade secrets.**

72.     On or about July 14, 2026, Flex learned that Anderson had been hired as Split Pay's new CFO. Given that Anderson was in possession of Flex trade secrets, including the Flex Margin Model and Board Memorandum, Flex was immediately alarmed by his hiring by Split Pay, particularly given Split Pay's prior attempts to steal Flex's confidential information through former Flex employees and history of deceptive business practices. Split Pay's sudden, dramatic shift to a business strategy substantially similar, if not identical, to Flex's strategy only heightened Flex's concern that its trade secrets and confidential information were being

17

misappropriated.

73.     Seeking confirmation that its trade secrets and confidential information were not being misused, on July 14, 2026, Flex's Chief Legal Officer wrote to Split Pay and Anderson demanding written confirmation that they have not and will not use or disclose any Flex confidential information. Given the urgency of the matter, Flex requested a response by July 17, 2026. Although Anderson eventually responded to Flex's letter on July 23, 2026, his response raised more questions than answers. Suspiciously, he did not deny using or disclosing Flex's confidential and trade secret information, nor did he say whether he still had it in his possession. This response only served to heighten Flex's concern.

74.     As of the filing of this Complaint, Split Pay has remained completely silent, refusing to provide any assurances whatsoever that Flex's trade secrets have not been misappropriated.

## CLAIMS FOR RELIEF

### COUNT I
(Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act,
18 U.S. § 1836, *et seq.*)

75.     Flex incorporates the allegations of each of the previous paragraphs and realleges them as if set forth fully herein.

76.     Flex's trade secrets relate to products or services used, sold, purchased, or transported, or intended for use, sale, purchase, or transcript in interstate commerce across the country.

77.     At all relevant times, Flex owned and had the right to possess the trade secrets misappropriated by Defendants, including those in the Flex Margin Model and the Flex Board Memorandum.

78.     As set forth above, Anderson improperly disclosed, and Split Pay improperly

18

acquired and used, confidential and proprietary financial and business information of Flex constituting trade secrets as defined by 18 U.S.C. § 1839(3), including without limitation information in the Flex Margin Model and the Flex Board Memorandum, with Split Pay acquiring and using that information knowing that Anderson had obtained it from Flex under an NDA that prohibited its disclosure or use for any purpose other than Anderson's CFO candidacy.

79.     Flex spent tremendous time, effort, and resources developing and cultivating the misappropriated trade secrets, including those in the Flex Margin Model and Flex Board Memorandum. Flex's trade secrets are not generally known or available to the public, and derive independent economic value from not being generally known to the public, to Flex's competitors or to other persons who can obtain economic value from the disclosure or use of the information.

80.     At all relevant times, Flex has taken efforts reasonable under the circumstances to maintain the secrecy of its confidential and proprietary financial and business information, including those in the Flex Margin Model and Flex Board Memorandum. These efforts include storing the information on password protected computer systems accessible only to Flex employees and providing access only on a "need to know basis." These measures further include promulgating and enforcing internal policies governing the protection of Flex's confidential and proprietary information, and requiring all Flex employees and any other recipients of the information, such as Anderson, to sign confidential and/or nondisclosure agreements.

81.     Upon information and belief, Split Pay knew or had reason to know that Anderson obtained Flex's confidential and trade secret information through his candidacy for Flex's CFO position and that Anderson was required to maintain the information's confidentiality. Notwithstanding its knowledge of the confidential nature of the information, Split Pay acquired, used, and benefitted from Flex's trade secrets.

19

82.     Defendants' actions with respect to Flex's trade secrets, as alleged above, were a deliberate scheme and plan to deprive Flex of the benefits of Flex's own substantial investment and efforts and steal the fruits of years of Flex's labor.

83.     Defendants' acts of misappropriation of Flex's trade secrets include, but are not limited to, using and disclosing the trade secrets to copy Flex's go-to-market business model and to target Flex's existing business partners.

84.     Defendants' improper acquisition and use of Flex's trade secrets, actual and/or threatened, constitute "misappropriation" within the meaning of 18 U.S.C. § 1839(5) and violate the Defend Trade Secrets Act.

85.     As a direct and proximate result of Defendants' wrongful misappropriation of Flex's trade secrets, Flex has suffered actual damages, including but not limited to loss of profits, goodwill, competitive advantage, and business opportunities, and will continue to suffer actual damages in a sum to be set forth according to proof at trial. Additionally, as a proximate result of its misappropriation of Flex's trade secrets, Defendants have been unjustly enriched.

86.     As the direct and proximate result of Defendants' conduct, Flex has suffered irreparable injury and is entitled to temporary, preliminary, and permanent injunctive relief and permanent injunctive relief to protect its confidential and trade secret information by: returning Flex's trade secrets, including the Flex Margin Model and the Flex Board Memorandum, barring Defendants from accessing or in any way using any copies of the trade secrets or any files or information derived therefrom, preserving all evidence, and not using or disclosing or further using or disclosing any trade secret or other confidential information obtained by Anderson from Flex.

87.     As described herein, Defendants' conduct was, and is, malicious, fraudulent,

20

deliberate, and willful. Flex is therefore entitled to recover from Defendants' exemplary damages as permitted by 18 U.S.C. § 1836(b)(3)(C) and entitled to an award of attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

## COUNT II
### (Common Law Misappropriation of Trade Secrets)

88. Flex incorporates the allegations of each of the previous paragraphs and realleges them as if set forth fully herein.

89. Flex's trade secrets as described above constitute trade secrets within the meaning of the common law.

90. Flex's trade secrets that Defendants' misappropriated derive economic value, both actual and potential, from not being generally known and not being readily ascertainable through proper means by Flex's competitors or to other persons who can obtain economic value from the disclosure or use of the information.

91. At all relevant times, Flex has taken the above-described reasonable efforts under the circumstances to maintain the secrecy of its confidential and proprietary financial and business information.

92. Upon information and belief, Split Pay knew or had reason to know that Anderson obtained Flex's confidential and trade secret information through his candidacy for Flex's CFO position and that Anderson was required to maintain the information's confidentiality. Notwithstanding its knowledge of the confidential nature of the information, Split Pay acquired, used, and benefitted from Flex's trade secrets.

93. Defendants' actions, as set forth herein, constitute "misappropriation" within the meaning of the common law.

94. As a direct and proximate result of Defendants' wrongful misappropriation of

21

Flex's trade secrets, Flex has suffered actual damages, including but not limited to loss of profits, goodwill, competitive advantage, and business opportunities, and will continue to suffer actual damages in a sum to be set forth according to proof at trial. Additionally, as a proximate result of its misappropriation of Flex's trade secrets, Defendants have been unjustly enriched.

95. Flex's trade secrets are in continuous use in the operation of Flex's business.

96. Anderson misappropriated Flex's trade secrets in breach of his NDA with Flex and through improper means, and Split Pay misappropriated those trade secrets by acquiring and using them with knowledge that Anderson had disclosed them in breach of his NDA and a duty of confidentiality owed to Flex.

97. Defendants' actions in misappropriating Flex's trade secrets was willful, fraudulent, malicious, and was done with the intent to injure or oppress Flex and improve Defendants' own economic opportunities, thereby justifying an award of punitive damages against Defendants.

98. As the direct and proximate result of Defendants' conduct, Flex has suffered irreparable injury and is entitled to temporary, preliminary, and permanent injunctive relief and permanent injunctive relief to protect its confidential and trade secret information by: returning Flex's trade secrets, including the Flex Margin Model and the Flex Board Memorandum, barring Defendants from accessing or in any way using any copies of the trade secrets or any files or information derived therefrom, preserving all evidence, and not using or disclosing or further using or disclosing any trade secret or other confidential information obtained by Anderson from Flex.

## COUNT III
(Breach of Contract as to Anderson)

99. Flex incorporates the allegations of each of the previous paragraphs and realleges

them as if set forth fully herein.

100.    Flex and Anderson entered into a valid NDA supported by adequate consideration.

101.    Flex has complied with and fulfilled its obligations under the NDA.

102.    The NDA is lawful and binding upon the parties.

103.    The Flex Margin Model and Flex Board Memorandum that Anderson received from Flex are "Confidential Information" as defined in the NDA.

104.    Anderson breached the NDA, including but not limited to Sections 3(a), 3(b), and 3(d) of the NDA by retaining, disclosing and using Confidential Information at times and for purposes prohibited by the NDA. Anderson disclosed the Confidential Information to Split Pay and used the Confidential Information for purposes unrelated to his consideration of an employment opportunity with Flex.

105.    As a direct and proximate result of Anderson's breaches, Flex has sustained and will sustain direct and indirect damages, including special and consequential damages.

106.    Anderson has been unjustly enriched as a further proximate result of his breaches.

### COUNT IV
(Unfair Competition)

107.    Flex incorporates the allegations of each of the previous paragraphs and realleges them as if set forth fully herein.

108.    By doing the things described above, Defendants have engaged in unfair competition by misappropriating the results of the labor, skill, and expenditures of Flex.

109.    In misappropriating Flex's trade secrets and confidential information, Defendants acted in bad faith, exploiting commercial advantage which belonged exclusively to Flex. Split Pay did so with knowledge that Anderson was bound by an NDA prohibiting him from

23

disclosing or using Flex's confidential information.

110. As a direct and proximate result of Defendants unfair competition, Flex has sustained and will sustain damages in an amount to be determined by trial.

111. Defendants have been unjustly enriched as a further proximate result of their unfair competition.

112. Defendants conduct was intentional, willful and malicious thus justifying the award of punitive and/or exemplary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Flex prays that this Court enter judgment in its favor on the causes of action set forth above and awards Flex relief including, but not limited to, the following:

1. An order which temporarily, preliminarily, permanently enjoins Defendants to return to Flex, and to refrain from further misappropriating, any of Defendants' proprietary, confidential or trade secret information;

2. An order directing Defendants to account for, and to pay over to Flex, all gains, profits, and advantages derived by Defendants from the above-described wrongful acts;

3. Compensatory damages in an amount to be proven at trial;

4. Exemplary or punitive damages for Defendants' intentional conduct, according to proof;

5. Reasonable attorneys' fees and costs incurred in bringing and litigating this action as allowed by law; and

6. All other such remedies or equitable relief as the Court deems just and proper.

## **JURY DEMAND**

Flex hereby demands a jury trial for all issues so triable.

24

Respectfully submitted,
SHAPIRO ARATO BACH LLP

Dated: August 3, 2026

By:    */s/ Jonathan P. Bach*
JONATHAN P. BACH - #2475366
1140 Avenue of the Americas, 17th Fl.
New York, NY 10036

BENJAMIN BERKOWITZ *(pro hac vice forthcoming)*
MATTHEW M. WERDEGAR *(pro hac vice forthcoming)*
KHARI J. TILLERY *(pro hac vice forthcoming)*
LAUREN S. KANE *(pro hac vice forthcoming)*
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:  415 391 5400
Facsimile:  415 397 7188

Attorneys for Plaintiff
FLEXIBLE FINANCE INC.

25